IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

WILFREDO URBINA, DAYSHAUN SCOTT,
WESLEY LISBY, EDDY TEJEDA, and
DANIEL TORRES,

     PLAINTIFFS

     vs                           COMPLAINT [JURY TRIAL]

THE CITY OF NEW YORK, a
municipal entity, NEW YORK
CITY POLICE OFFICERS"JOHN DOES"
and "SALLY ROWES", individually
and in their official capacities,
NEW YORK CITY POLICE OFFICER KEVIN
LO, Shield # 04425, individually
and in his official capacity,
NEW YORK CITY POLICE OFFICER
KAREN ROJAS, Shield # 17650,
individually and in his official
capacity,

     DEFENDANTS
_____

## I. INTRODUCTION

1.  This is a litigation which arises out of event
that occurred on February 22, 2014 commencing at or about
3:00 A.M.in and/or about and/or proximate to 1201 Elder
Street (in the vicinity of Westchester Avenue), Bronx,
New York.

2.  This is an action in which each of the Plaintiffs
seeks relief for the violation of his respective rights as
guaranteed under the laws and Constitution of the United
States and, as well, under the laws and Constitution of the
State of New York.

3.  Each of the Plaintiffs seeks monetary damages and
such other relief, including injunctive relief and declara-
tory relief [if appropriate], as may be in the interest of
justice and as may be required to assure that each of the

Plaintiffs secures full and complete relief and justice for
the violation of their respective rights.

## II. JURISDICTION

4.   Jurisdiction of this Court is invoked pursuant to
and under 28 U.S.C. Sections 1331 and 1343 and 1367 in con-
junction with the Civil Rights Acts of 1866 and 1871, 42
U.S.C. Sections 1983, 1985, and 1986; and in conjunction
with the Fourth and Thirteenth and Fourteenth Amendments to
the United States Constitution; and, as well, in conjunc-
tion with the laws and Constitution of the State of New
York.

5.   Each of the Plaintiffs requests that the Court in-
voke pendent claim and pendent party jurisdiction pursuant
to the discretion vested in the Court to do so under 28
U.S.C.  Section 1367 (otherwise known as Supplemental Pen-
dent Claim/Pendent Party Jurisdiction).

6.   The State law claims derive from the same occur-
rence and transaction that give rise to the federal law
claims; and the State law based claims have a common nucle-
us of operative fact with the federally based claims.

7.   Each of the Plaintiffs also invokes the jurisdic-
tion of this Court in conjunction with the Declaratory
Judgment Act, 28 U.S.C. Sections 2201, et seq., this being
an action in which the respective Plaintiffs seek, in addi-
tion to monetary damages, whatever other relief is needed
to provide full and complete justice including, if appro-
priate, declaratory and injunctive relief.

8.   This is an action in which each of the Plaintiffs
seeks relief for the violation of his respective rights as
guaranteed under the laws and Constitution of the United
States and, as well, as guaranteed under the laws and Con-
stitution of the State of New York.

9.   Venue for this litigation resides in the United
States District Court for the Southern District of New York
(Manhattan Division)given that the incident/event, which
gives rise to this litigation, took place within the geo-
graphic boundaries of this Court and this Division (the
City of New York, the County of the Bronx), given that the
Defendants have their places for doing business within the

geographic boundaries of this District and this Division
(the City of New York and/or the County of the Bronx), and
given that each of the Plaintiffs, save for one (Wilfredo
Urbina) has his residence within the geographic boundaries
of this District (the City of New York, the County of the
Bronx) and this Division

III. THE PARTIES

10.   Save for Plaintiff Wilfredo Urbina who is an Amer-
ican citizen but resides in Ridgefield Park, New Jersey,
each of the other Plaintiffs is an American citizen and
each resides in the City of New York, the County of the
Bronx, and the State of New York.

11.   Each of the Plaintiffs is either Latino and/or an
African American and each is more specifically described
hereinafter in Paragraphs set forth hereinafter in the Al-
legations Section of this Complaint document.

12.   The Defendant City of New York is a municipal en-
tity which was created under the authority of the laws and
Constitution of the State of New York and which is autho-
rized with, among other powers, the power to maintain a po-
lice department for the purpose of protecting the welfare
of those who reside in the City of New York.

13.   Defendants "John Does" and "Sally Rowe" and Kevin
Lo, Shield # 04425, and Karen Rojas, Shield # 17650, are
New York City Police Officers and agents and employees of
the City of New York.

14. Although their respective actions and conduct here-
in described were unlawful and wrongful and otherwise vio-
lated the Plaintiffs' respective rights as guaranteed under
the laws and Constitution of the United States and, as
well, under the laws and Constitution of the State of New
York, the actions and conduct were taken in and during the
course of their duties and functions as New York City Po-
lice Officers and as agents and employees of the City of
New York and incidental to the otherwise lawful performance
of their duties and functions as New York City Police Offi-
cers and agents and employees of the City of New York.

IV. ALLEGATIONS

15.   This is a litigation which arises out of event which occurred on February 22, 2014 commencing at or about 3:00A.M.in and/or about and/or proximate to 1201 Elder Street (in the vicinity of Westchester Avenue), Bronx, New York, an area which is a predominantly Hispanic populated neighborhood.

16.   The event involved the Plaintiffs, a group of Hispanic individuals believed to be residents of the neighborhood, and numerous New York City Police Officers including a young male Officer believed to be New York City Police Officer Kevin Lo and including a female Officer believed to be Karen Rojas and including a number of other male and female New York City Police Officers whose specific name identities are not now known.

17.   The Plaintiffs are Wilfredo Urbina, Dayshaun Scott, Wesley Lisby, Eddy Tejeda, and Daniel Torres.

18.   Except for Plaintiff Wilfredo Urbina who is a resident of Ridgefield Park, New Jersey, each of the other Plaintiffs is a resident of the City of New York, the County of the Bronx, and the State of New York.

19.   Plaintiff Wesley Lisby is twenty eight [28] years of age.

20.   Plaintiff Wesley Lisby's birth date is March 7, 1986.

21.   Plaintiff Wesley Lisby resides at 414 East 154th Street, Apt. # 1F, Bronx, New York 10455.

22. Plaintiff Wesley Lisby has resided at the foregoing address for approximately eighteen [18] years.

23. Plaintiff Wesley Lisby resides at the foregoing address with his mother, his sister, and his brother.

24.   Plaintiff Wesley Lisby was born in Brooklyn, New York.

25.  Plaintiff Wesley Lisby grew up in Queens, New York, the Bronx, New York and, for a period of time when he was in middle school, in Georgia.

26.  Plaintiff Wesley Lisby attended Roberto Clemente High School in the Bronx.

27.  Plaintiff Wesley Lisby went through the 10th Grade at Roberto Clemente High School.

28.  Plaintiff Wesley Lisby obtained his GED degree in 2008.

29.  The Plaintiff Wesley Lisby is single and has no children.

30.  While Plaintiff Wesley Lisby is presently unemployed (as of the date of this document), the Plaintiff has been regularly employed throughout his young adult life including, among other positions, positions at the Hunts Point Multi Service Crisis Center; at D'Agostino; at Bed, Bath, and Beyond; and positions in the construction industry, in the catering industry, and in the security industry.

31.  Plaintiff Dayshaun Scott is twenty eight [28] years of age.

32.  Plaintiff Dayshaun Scott's birth date is July 14, 1986.

33.  Plaintiff Dayshaun Scott resides at 129 West 170th Street, Apt. # 3A, Bronx, New York 10452.

34.  Plaintiff Dayshaun Scott has resided at the foregoing address for approximately six or seven years.

35.  Plaintiff Dayshaun Scott resides at the foregoing residence with his mother.

36.  Plaintiff Dayshaun Scott was born and raised in the Bronx, New York where he attended elementary and middle school.

37.   Plaintiff Dayshaun Scott attended John F. Kennedy High School in the Bronx although he did not graduate from high school.

38.   Plaintiff Dayshaun Scott is single.

39.   Plaintiff Dayshaun Scott has four children.

40.   Plaintiff Dayshaun Scott has been employed regularly over the last four years working for a independent sub-contractor associated with Verizon communication services.

41.   Plaintiff Daniel Torres is twenty six [26] years old.

42.   Plaintiff Daniel Torres's birth date is May 23, 1988.

43.   Plaintiff Daniel Torres resides at 381 East 152nd Street, Apt. # 1A, Bronx, New York 10455

44.   Plaintiff Daniel Torres has resided at the foregoing address for approximately thirteen [13] years.

45.   Plaintiff Daniel Torres resides at the foregoing address with his mother, stepfather, and four siblings.

46.   Plaintiff Daniel Torres was born and raised in the Bronx, New York.

47.   Plaintiff Daniel Torres attended Samuel Gompers High School.

48.   Plaintiff Daniel Torres is currently attending college at City Tech in Brooklyn, New York.

49.   Plaintiff Daniel Torres has been regularly employed throughout his young adult life including in positions at the Bronx Rooms Service for over five [5] years and at the Hunts Point Fulton Market for approximately two [2] years.

50.   Plaintiff Daniel Torres is single and has no children.

51.   Plaintiff Wilfredo Urbina is twenty seven [27] years old.

52.   Plaintiff Wilfredo Urbina's birth date is February 7, 1987.

53.   Plaintiff Wilfredo Urbina resides at 4 Orchard Street, Ridgefield Park, New Jersey 07660.

54.   Plaintiff Wilfredo Urbina has resided at the fore-going address for approximately one [1] year.

55.   Plaintiff Wilfredo Urbina resides at the foregoing address with his fiancé and her father.

56.   Plaintiff Wilfredo Urbina was born and raised in the Bronx, New York.

57.   Plaintiff Wilfredo Urbina attended elementary and middle school in the Bronx, New York.

58.   Plaintiff Wilfredo Urbina attended the Bronx Leadership Academy High School.

59.   Throughout his young adult life, Plaintiff Wilfredo Urbina has been regularly employed including, among his positions, at Allied Beverage, Inc. [as a truck driver], at Conway [as a stock person], at Century 21 [as a salesperson], and at American Self Storage.

60. Plaintiff Wilfredo Urbina is engaged to be married and recently he and his fiancé' had a son in July, 2014.

61.   Plaintiff Eddy Tejeda is twenty eight [28] years old.

62.   Plaintiff Eddy Tejeda's birth date is December 31, 1985.

63.   Plaintiff Eddy Tejeda resides at 1201 Elder Street, Apt, # 4, Bronx, New York.

64.   Plaintiff Eddy Tejeda has resided at the foregoing residence for approximately seven [7] years.

65.   Plaintiff Eddy Tejeda resides alone at the foregoing location.

66.   Plaintiff Eddy Tejeda has one child.

67.   Plaintiff Eddy Tejeda was born and raised in the Bronx, New York.

68.   Plaintiff Eddy Tejeda attended elementary and middle schools in the Bronx, New York.

69.   Plaintiff Eddy Tejeda attended and graduated from Bronx Regional High School.

70.   Throughout his young adult life, Plaintiff Eddy Tejeda has been regularly employed including positions in construction, in a position at Manhattan College, and in a position at the Jacob Javitts Center.

71.   This is a litigation which arises out of event which occurred on February 22, 2014 commencing at or about 3:00 A.M. in and/or about and/or proximate to 1201 Elder Street (in the vicinity of Westchester Avenue), Bronx, New York, a location which is in a predominantly Hispanic populated neighborhood/community.

72.   The Plaintiffs are friends and each has known the others for several years.

73.   Often times the Plaintiffs come together at the apartment of Eddy Tejeda which is located at 1201 Elder Street (in the vicinity of Westchester Avenue), Bronx, New York.

74.   Eddy Tejeda's residence in the building is Apt. # 4. It is located one floor above the street level lobby of the 1201 Elder Street building, a building which is approximately five stories in height.

75.   There are windows in the Tejeda apartment, including a window in the kitchen and a window in the bathroom, both of which look out on the street.

76.   There are two bedrooms in the apartment, a long hallway, a living room, a kitchen, and a bathroom.

77. The Plaintiffs would often come together at the Tejeda apartment and play and make music and sleep over at the apartment as friends of their respective ages often do, particularly if and when they gather at the apartment, at times late in the night/early morning, playing and making music.

78. On February 22, 2014, Plaintiffs Wilfredo Urbina, Dayshaun Scott, Wesley Lisby, and Daniel Torres went to a family party at an apartment located on St. Anne's Avenue (and Westchester Avenue), Bronx, New York.

79. Plaintiff Daniel Torres was driving his vehicle, a 2000 BMW (model 323I); and, for purposes of the evening, he was the designated driver who would transport the others to their respective residences once their evening together was completed.

80. Plaintiff Urbina, Scott, Lisby, and Torres arrived at the party on the night of February 21, 2014 and remained at the party until approximately 3:00 A.M. when they left, together, in the vehicle being driven by Plaintiff Torres.

81. They left the party at or about 3:00 A.M. when and after Plaintiff Lisby received a telephone call from Eddy Tejeda and it was then agreed that Plaintiffs Urbina, Scott, Lisby and Torres would go to Plaintiff Tejeda's apartment where they expected to play and to make some music, as they had regularly done over the years, and eventually "crash" (sleep) at Tejeda's apartment when the Plaintiffs concluded their music session.

82. Plaintiff Tejeda's residence at 1201 Elder Street (in the proximity of Westchester Avenue) is approximately a ten minute car ride from the location where Plaintiffs Urbina, Scott, Lisby, and Torres were in attendance.

83. Plaintiff Torres, who as noted previously was the designated driver that night, drove his vehicle to Plaintiff Tejeda's apartment; and, as previously noted, it was expected that he would drive Plaintiffs Urbina, Scott, and Lisby to their respective residences in the morning after "crashing" at Plaintiff Tejeda's apartment.

84.   Plaintiff Lisby was in the front passenger seat of Plaintiff Torres's BMW four door vehicle and Plaintiffs Urbina and Scott were in the back seat of the vehicle.

85.   At or about 3:00 A.M., Plaintiffs Torres, Lisby, Scott, Torres, and Urbina arrived in the Torres BMW vehicle at the vicinity of 1201 Elder Street (in proximity to Westchester Avenue).

86.   Plaintiff Torres observed a parking space at or about the corner of Elder Street and Westchester Avenue which space was across the street from the building in which Plaintiff Tejeda's apartment was located (one floor up from street level).

87.   The space, proximate to the corner, was between a vehicle, at one end, and what appeared to be a traffic or construction "cone" at the other end of the space (proximate to a fire hydrant at the location).

88.   The space was at the curb that was proximate to a convenience store across the street from the building in which Plaintiff Tejeda's apartment was situated, one floor up from street level; and, when the window in the apartment was open, the space was within a mildly loud, non shouting, non screaming conversational tone distance from the apartment across the street to the area of the space where Plaintiff Torres envisioned parking his vehicle.

89.   As Plaintiff Torres was endeavoring to pull the vehicle into the space, Plaintiff Lisby opened the front seat passenger door and exited the vehicle, leaving the door slightly ajar as he exited.

90.   As he exited, Plaintiff Lisby observed Plaintiff Tejeda in the open kitchen widow. Plaintiff Lisby also observed Carron, another friend, at the window.

91.   Plaintiff Tejeda called out to Plaintiff Lisby, whom he observed out of the vehicle and near the convenience store; and Plaintiff Tejeda requested that Plaintiff Lisby go into the convenience store and purchase some beer.

92.   As Plaintiff Lisby was preparing to go into the convenience store and while Plaintiff Torres was still endeavoring to park his vehicle, Plaintiff Lisby informed

Plaintiff Torres that he was going into the store and
Plaintiff Torres, in turn, indicated that he wanted Plain-
tiff Lisby to wait and to assist him with direction into
the space.

93.   At or about the same time, Plaintiff Lisby heard
someone shouting toward him.

94.   Plaintiff Lisby noticed then three males and a fe-
male (all of whom he believed to be Hispanic and all of
whom it is believed were in fact Hispanic) shouting some-
thing at him which he did not clearly hear and/or under-
stand —something like "gay, gay" or "gol col", the latter
of which is believed to be a racially derogatory Spanish
slang term that is the equivalent in its implication to the
English language racially derogatory "n" word/term.

95.   Plaintiff Lisby spoke back at the Hispanic indi-
viduals.

96.   At the same time, Plaintiff Lisby observed Plain-
tiffs Wilfredo Urbina and Dayshaun Scott exiting Plaintiff
Torres's vehicle.

97.   When Plaintiff Lisby spoke back to the shouting
Hispanic individuals, he did so in what he would describe
as a non shouting, albeit perhaps slightly elevated, con-
versational tone (so as to be heard over the shouting being
directed at him by the group of three male and one female
Hispanic individuals).

98.   In addition to screaming at Plaintiff Lisby in
a racially derogatory and hostile and threatening and ag-
gressive manner, the three male Hispanic individuals and
the one female Hispanic individual were otherwise project-
ing hostile and aggressive body movement that caused Plain-
tiff Lisby to believe that he was not welcome by the His-
panic individuals to be at that location and that caused
Plaintiff Lisby to be afraid and concerned for his safety.

99.   At the same time that the Hispanic individuals
were screaming and acting in concert in a hostile and ag-
gressive manner and fashion and otherwise utilizing a
racially derogatory term(as described) and at the same time
Plaintiffs Urbina and Dayshaun exited Plaintiff Torres's
vehicle, Plaintiff Lisby observed a young, male Asian ap-

pearing uniformed New York City Police Officer, on a scoot-
er, arrive at the location.

100.   It is believed that the Officer was Kevin Lo,
Shield # 04425.

101.   It is believed, as well, that, as the New York
City Police Officer (believed to be Defendant Officer Lo)
arrived, the Police Officer heard and observed what the
Hispanic individuals, acting together and in concert with
each other, were doing; and he heard what they were scream-
ing including the racially derogatory, hostile, aggressive
and charged term/phrase.

102.   As the Police Officer arrived, Plaintiff Lisby saw
one of the three Hispanic males bend down as if to kneel on
the sidewalk and put his hands up; and, then, stand up and,
with the others (with whom he was screaming and acting in
concert and together) turn as if to leave.

103.   At no time did Plaintiff Lisby, who was observing
and hearing all of that which was transpiring, including
his observation of the Police Officer arriving while the
group of Hispanic individuals were screaming and acting in
the manner and fashion described, see the Police Officer,
go up to the three Hispanic males and the one Hispanic fe-
male, none of whom had yet left the area, and address them
regarding that which was transpiring and what Plaintiff
Lisby believes the Police Officer had observed and heard
transpiring.

104.   Plaintiff Lisby did not see the Police Officer do
so notwithstanding that Plaintiff Lisby believed that the
Police Officer had the opportunity and ability to do so and
notwithstanding that it is believed that the Police Officer
knew or should have known that Plaintiff Lisby was the sub-
ject of threatening conduct directed at him by the group of
the Hispanic individuals.

105.   Plaintiff Lisby was surprised that the arriving
Police Officer did not approach the screaming and aggres-
sively acting group of Hispanic individuals.

106.   Plaintiff Lisby was surprised since the aggressive
and hostile and racially offensive and threatening scream-
ing and actions of the Hispanic individuals was being di-

rected at Plaintiff Lisby and since Plaintiff Lisby was
simply being there and being the subject of the hostility
and aggression and Plaintiff Lisby was not doing anything
which would or should have caused the Officer to approach
him or Plaintiffs Urbina and Scott who had exited Plain-
tiff' Torres's vehicle and, like Plaintiff Lisby, were just
there and doing nothing but being there at the location.

107.   Plaintiff Lisby observed the Police Officer, who
had arrived at the location (as described), point at Plain-
tiff Urbina, who as noted previously had exited Plaintiff
Torres's vehicle, and direct him to get up to the front of
the proximately situated convenience store.

108.   Plaintiff Lisby observed Plaintiff Urbina comply
and offer no resistance whatsoever to the directive.

109.   Plaintiff Scott, who had exited Plaintiff Torres's
vehicle with Plaintiff Urbina and was just being there,
re-entered Plaintiff Torres's vehicle; and Plaintiff Torres
and Plaintiff Lisby left in the vehicle to go down the
block and find another space to park the vehicle, something
which they succeeded in doing a short distance away from
the convenience store location.

110.   Plaintiffs Scott and Torres exited the Torres ve-
hicle and went back to the location by the convenience
store location where they observed Plaintiff Urbina up
against the store front and being frisk searched by a Po-
lice Officer believed to be Officer Lo.

111.   Plaintiff Lisby, who was present at the location
throughout the foregoing period, observed that Plaintiff
Urbina was compliant and was not resisting, verbally or
physically.

112.   Plaintiff Lisby did not see the three Hispanic
males and the one Hispanic female, who had been screaming
at him and who had been acting aggressively and in a
racially hostile manner and fashion toward him just a brief
period before, confirming for Plaintiff Lisby that, as he
last saw the three Hispanic males and the Hispanic female,
they had turned in order to leave the location and that
they had in fact left the location.

113. All of the foregoing transpired in a relatively brief period of time-- from the start to that point in time.

114. Plaintiff Tejeda, having initially observed the situation from his window, had come downstairs from his apartment (within a very brief period of time after Plaintiff Lisby had initially exited Plaintiff Torres's vehicle—as described).

115. Plaintiff Lisby observed Plaintiff Tejeda and the afore-mentioned Carron, who had come down to the street from Plaintiff Tejeda's apartment with Plaintiff Tejeda, outside the building.

116. Plaintiff Lisby and Carron entered into the Plaintiff Tejeda's building and went up to his apartment.

117. Plaintiff Tejeda remained outside.

118. When Plaintiff Lisby entered Plaintiff Tejeda's apartment one floor up from the street, Plaintiff Lisby entered the bathroom and opened the window and observed what was transpiring outside.

119. Plaintiff Lisby observed Plaintiff Urbina by the store front across the street being frisk searched by a female officer.

120. Plaintiff Lisby observed Plaintiff Tejeda with uniformed New York City Police Officers by his building and observed other New York City Officers and several New York City Police Department vehicles at the location.

121. Plaintiff Lisby did not observe the three Hispanic males and the one Hispanic female who had been screaming at him and acting hostilely and aggressively toward him (while spewing what is believed to be racially derogatory, hostile, and threatening words) when he first exited the vehicle after Plaintiff Lisby first arrived at the location (as described above).

122. Plaintiff Lisby observed Plaintiff Urbina being frisk searched by what appeared to him to be a uniformed female New York City Police Officer and shouted out (he was not screaming or yelling as such was not required given the

distance) that Plaintiff Urbina had already been frisk searched by a male police officer.

123.  At that time, Plaintiff Lisby observed many police officers at the location

124.  At the same time Plaintiff Lisby was observing the foregoing, Plaintiff Lisby, being in proximity to the location where Plaintiff Tejeda was standing with New York City Police Officers and being only one floor up from the street level, heard an Officer ask Plaintiff Tejeda whether he lived in the building to which Plaintiff Lisby heard Plaintiff Urbina respond yes.

125.  Plaintiff Lisby heard a New York City Police Officer direct Plaintiff Tejeda to take them to his apartment.

126.  Plaintiff Lisby heard Plaintiff Tejeda respond with an inquiry as to why he was being directed to do so.

127.  At that time and while such was occurring, Plaintiff Lisby was in the apartment; and the previously mentioned Carron was in the apartment as well (it is believed in the living room).

128.  In addition, Plaintiff Eddy Tejeda's younger brother, Steven, was in the apartment sleeping in one of the two apartment bedrooms.

129.  Shortly after Plaintiff Lisby heard the exchange between the Police Officers and Plaintiff Tejeda (as described), two Police Officers forced Plaintiff Tejeda, at gunpoint, to go up the stairs to Plaintiff Tejeda's apartment.

130.  When the two Police Officers and Plaintiff Tejeda arrived at the door to Plaintiff Tejeda's apartment, Plaintiff Tejeda told the Officers that he did not want them to go into his apartment.

131.  Plaintiff Tejeda was then physically moved out of the way by the Police Officers who then forced themselves into the apartment (without the consent of Plaintiff Tejeda and in fact with the explicit statement of Plaintiff Tejeda that he was not authorizing the Police Officers' entry into his apartment).

132.   The Police Officers gained entry to Plaintiff Tejeda's apartment without the voluntary consent of Plaintiff Tejeda but, rather, through their coercive conduct and without any objectively reasonable justification or exigent circumstance to justify the entry into Plaintiff Tejeda's apartment.

133.   While still in the bathroom, Plaintiff Lisby heard banging inside of Plaintiff Tejeda's apartment as if someone was banging on doors and/or walls inside of the apartment.

134.   When inside of Plaintiff Tejeda's apartment, New York City Police Officers did enter into the bedrooms and rousted Steven (Plaintiff Tejeda's brother) who was then in a bed in one of the bedrooms and was sleeping before being rousted by the Police Officers.

135.   Plaintiff Lisby opened the door to the bathroom and a Police Officer asked Plaintiff Lisby what he was doing in the bathroom.

136.   Plaintiff Lisby responded, in substance, he was going to the bathroom, to which a Police Officer stated, in substance, yeah, right.

137.   Plaintiff Lisby was placed against a wall and subjected to a frisk search for which there was absolutely no legal or other justification.

138.   Police Officers were searching throughout the apartment.

139.   Police Officers entered into the bedrooms where, as noted, Plaintiff Tejeda's brother, Steven, was sleeping (in one of the bedrooms).

140.   The Police Officers over-turned a couch.

141.   The Police Officers looked in drawers.

142.   Plaintiff Tejeda was directed by a Police Officer to provide his identification for which there was no justification.

143.  Under the coercive threat imposed by Police Offi-
cers in Plaintiff Tejeda's apartment and which had existed
for some time prior thereto even before Plaintiff Tejeda
entered into his apartment with Police Officers (under the
coercion imposed by the Police Officers to allow them to
gain access to and to enter into the apartment), Plaintiff
Tejeda complied with the directive.

144.  At or about this point in time in the context of
the over-arching event (as previously described herein),
Plaintiff Daniel Torres and Plaintiff Dayshaun Scott and
Plaintiff Wilfredo Urbina had entered into the apartment.

145.  As previously noted, before the overall event (as
described to this point) commenced, Plaintiffs Torres,
Scott, and Urbina, along with Plaintiff Lisby, had been in-
vited by their friend, Plaintiff Tejeda (whose apartment it
was) to come to the apartment (as they had done on so many
occasions prior to that date) in order to make and play
some music and to spend the night.

146.  Plaintiffs Torres, Scott, and Urbina were directed
by Police Officers to leave the apartment; this not-
withstanding that Plaintiffs Torres, Scott, and Urbina had
been invited by Plaintiff Tejeda, whose apartment it was,
into the apartment and therefore had the right to be there
in the apartment as they were otherwise doing absolutely
nothing whatsoever unlawful or otherwise improper by being
inside of the apartment or when they were in the apartment
where, as noted, they had been invited by Plaintiff Tejeda,
and even though none of them had engaged in any improper
conduct while outside of the apartment.

147.  Plaintiff Torres asked the Police Officers in a
conversational tone and in a reasonable manner and fashion
why they were being required to leave when they had been
invited to the apartment by Plaintiff Tejeda who was their
friend and who had invited them to come to the apartment as
they had done on many previous occasions.

148.  Plaintiff Scott was simply observing as was Plain-
tiff Urbina; and they were not doing anything else but be-
ing present in the apartment and observing what was tran-
spiring.

149.   Plaintiffs Torres, Scott, and Urbina were given no answer by the Police Officers as to why they (Plaintiffs Torres, Scott, and Urbina) were being directed to leave.

150.   Plaintiffs Torres, Scott, and Urbina complied with the directive and they left the apartment, albeit under the coercive direction of Police Officers and albeit in the custody of the Police Officers.

151.   They were followed by and in the company of Police Officers who were, in sum and substance, detaining and taking Plaintiffs Torres, Scott, and Urbina out of the apartment and the building in the Police Officers' custody.

152.   The Police Officers also had Plaintiffs Lisby and Tejeda in custody with them as they left Plaintiff Tejeda's apartment along with Plaintiffs Torres, Scott, and Urbina.

153.   Plaintiff Lisby asked a female Police Officer, believed to be Officer Rojas, why they were being detained and forced out of the apartment to which they had been invited by the person whose apartment it was (Plaintiff Tejeda).

154.   Plaintiff Lisby further inquired into the whereabouts of the three Hispanic males and the one Hispanic female who had aggressively, hostilely, and threateningly acted out toward him while spewing what is believed to be racially derogatory and threatening words (as described).

155.   Plaintiff Lisby received no response to his inquiries.

156.   The Police Officers placed Plaintiffs Lisby and Tejeda by the front of Plaintiff Tejeda's building.

157.   Plaintiff Torres asked Police Officers why Plaintiff Lisby and Plaintiff Tejeda were being detained.

158.   One Police Officer, who is believed by the Plaintiffs to be a Captain, directed that Plaintiff Torres, Plaintiff Scott, and Plaintiff Urbina leave.

159.   That Police Officer then took his baton out.

160.   The Police Officer then propelled Plaintiff Torres' head into the glass of a storefront.

161.   The Police Officers then handcuffed Plaintiff Daniel Torres and placed him in a New York City Police Department vehicle.

162.   Plaintiffs Urbina and Scott were directed by Police Officers to get off the block.

163.   During this period of the event, Plaintiffs Torres, Scott, Tejeda, and Urbina saw many Police Officers milling about.

164.   The Plaintiffs did not, however, see the three Hispanic male individuals and the Hispanic female individual who were first present when Plaintiffs Torres, Scott, Urbina, and Lisby first arrived at the location at or about 3:00 A.M. or thereabouts (as described).

165.   Under the coercive threat of the Police Officers' directives that they leave and get off the block and notwithstanding that they were doing nothing unlawful and would have returned to Plaintiff Tejeda's residence where they had been invited and where they had been before directed by Police Officers to leave, Plaintiffs Urbina and Scott turned to go toward Willard Avenue when they were directed by Police Officers to go another way –toward Boynton Avenue.

166.   As they were walking away toward Boynton Avenue, Plaintiffs Scott and Urbina passed a building where they saw individuals inside of the glass window-door way of the building, one of whom was holding what appeared to be a machete type weapon.

167. Plaintiffs Scott and Urbina were scared and fearful that the individuals inside of the building were the Hispanic males who had confronted Plaintiff Lisby previously.

168. Plaintiffs Urbina and Scott believed such and were scared and feared because they believed that the direction, in which they were being compelled to walk by the direction of the Police Officers, was the direction in which the three male Hispanic individuals and the one female Hispanic individual had proceeded when they left the location.

169. Such is why Plaintiffs Urbina and Scott had initially turned and walked toward Boynton Avenue since it was in the opposite direction of the direction which they believed the four Hispanic individuals had left the location.

170. Plaintiffs Urbina and Scott became even more apprehensive and fearful and proceeded, then, in the direction of a convenience store-bodega a short distance past the building (as described) in the same direction that they were then walking.

171. Plaintiffs Urbina and Scott intended to go into the store and buy some food and, perhaps, then, in short order proceed onward to go to their homes or, perhaps, even go back to Plaintiff Tejeda's apartment.

172. However as they approached the bodega, it became apparent that the store was closed for entry into its premises although there was a widow available through which one could order items.

173. As they were at the window, Plaintiff Scott felt someone strike him on several occasions and to actually hit him with a machete type weapon causing his right forehead to begin to bleed, causing his back and other areas of his body to be injured, and causing the jacket, which he was then wearing, to be cut.

174. Plaintiff Scott went into the street when a uniformed female Police Officer (believed to be Latino) stopped him, observed the situation, and called for an ambulance which arrived shortly thereafter.

175. That uniformed female Police Officer appeared to be one of the Officers that Plaintiff Scott had previously seen that early morning back in the vicinity of Plaintiff Tejeda's apartment.

176. At that time, Plaintiff Scott inquired of the Police Officer as to Plaintiff Wilfredo Urbina's whereabouts since he was concerned for Plaintiff Urbina's safety and well being; but Plaintiff Scott was unsuccessful in gaining any information from the Officer about Plaintiff Urbina's whereabouts.

177.  Unbeknownst to Plaintiff Scott, at or about the time he was struck, Plaintiff Urbina, who was with Plaintiff Scott in the vicinity of the bodega (as described previously herein), was struck numerous times about his body with a machete type weapon.

178.  As a consequence of being struck as described, Plaintiff Urbina lost two full fingers on his left hand [the ring and pinky fingers] and his left hand middle finger was partially lost.

179.  In addition, Plaintiff Urbina's left palm was seriously cut; and he was cut in his leg and sliced along his arm and back.  Moreover, the jacket, which Plaintiff Urbina was wearing, was cut up and sliced in numerous respects in effect destroying the utility of the jacket as a garment.

180.  Several Police Officers were on the scene and it is believed that those Police Officers were Police Officers who had been back at the location and/or proximity of Plaintiff Tejeda's apartment.

181. It is believed that an unknown person (not a police officer) called for an ambulance which arrived and which transported Plaintiff Urbina to St. Barnabus Hospital where he received medical and health care services.

182.  Plaintiff Scott was transported by the ambulance which arrived at the scene to Lincoln Hospital.

183.  Plaintiff Scott was asked by the ambulance attendants if he had a particular hospital to which he wished to be transported.

184.  Because Lincoln Hospital was the hospital facility closest to where Plaintiff Scott's girlfriend resided in the Bronx, Plaintiff Scott requested the Lincoln Hospital.

185.  At the Lincoln Hospital facility, Plaintiff Scott received health care services and was subjected to various medical examinations and procedures.

186.  Plaintiff Scott received six stitches to close the wound that he had suffered on his right forehead [as described].

187.  Plaintiff Scott never received any citation (sum-
mons, desk appearance or otherwise), this notwithstanding
that, without any objectively reasonable basis for such, he
was actually and/or constructively seized when he was first
directed by New York City Police Officers to leave  Plain-
tiff Tejeda's apartment to which Plaintiff Scott had been
invited and where Plaintiff Scott was lawfully and properly
present (without being engaged in any unlawful or otherwise
improper conduct); and then, secondly and after having been
coerced to leave the apartment, Plaintiff Scott was direct-
ed by New York City Police Officers to leave and to get off
the block notwithstanding that Plaintiff Scott had done
nothing unlawful or otherwise improper and was lawfully and
properly and in his right to be on the block and, actually,
in his lawful right to be able to return to Plaintiff Teje-
da's apartment where, as noted, he had been invited and was
lawfully present when directed to leave the premises by New
York City Police Officers; and, thirdly and inter-related
to such, when Plaintiff Torres was arrested, without proba-
ble cause, and taken into custody thereby leaving Plain-
tiffs Urbina and Scott and Lisby without their designated
driver to take them to their respective residences when
they were, without any law enforcement justification,
forced to leave Plaintiff Tejeda's apartment(to which they
had been invited by Plaintiff Tejeda) and, then, to leave
the area altogether.

188.  Plaintiff Urbina did receive a summons for an open
container.  Later, without any objectively reasonable basis
for such, he was actually and/or constructively seized when
he was first directed by New York City Police Officers to
leave  Plaintiff Tejeda's apartment to which Plaintiff
Urbina had been invited and where Plaintiff Urbina was law-
fully and properly present (without being engaged in any
unlawful or otherwise improper conduct);  and then, sec-
ondly and after having been coerced to leave the apartment,
Plaintiff Urbina was directed by New York City Police Offi-
cers to leave and to get off the block notwithstanding that
he had done nothing unlawful or otherwise improper and was
lawfully and properly and in his right to be on the block
and, actually, in his right to be able to return to Plain-
tiff Tejeda's apartment where, as noted, Plaintiff Urbina
had been invited and was lawfully present when directed to
leave the premises by New York City Police Officers; and,
thirdly and inter-related to such, when Plaintiff Torres
was arrested, without probable cause, and taken into cus-

tody thereby leaving Plaintiffs Urbina and Scott and Lisby
without their designated driver to take them to their re-
spective residences when they were, without any law en-
forcement justification, forced to leave Plaintiff Tejeda's
apartment(to which they had been invited by Plaintiff Teje-
da) and, then, to leave the area altogether.


189.   But for the prior directive that Plaintiffs Urbina
and Scott and Torres were given to leave Plaintiff Tejeda's
apartment and to go home (when and while they were then in-
side of Tejeda's apartment where they had been invited and
where they expected to "crash"/sleep)—(as previously de-
scribed)—and but for the fact that, when on the street
Plaintiff Torres had been taken into custody and Plaintiffs
Scott and Urbina had been told to get off the block, Plain-
tiffs Urbina and Scott and Plaintiff Torres and Plaintiff
Lisby would have returned with Plaintiff Tejeda to his
apartment.

190.   Further and but for the fact that Plaintiff Torres
(as the individual, among the Plaintiffs who had a vehicle
and who was in effect the designated driver that night/
morning) had been arrested (without probable cause—that is
without an objectively reasonable factual basis to believe
that he had engaged in any criminal or other unlawful ac-
tivity whatsoever)and taken into custody and placed in a
police vehicle, Plaintiff Urbina and Plaintiff Scott, when
unlawfully and wrongly and improperly directed by a New
York City Police Officer to leave the area, would have been
able to get a ride from Plaintiff Torres back to their re-
spective homes (this because they were wrongly and improp-
erly and unlawfully precluded from staying at Plaintiff
Tejeda's apartment where they had been invited by Plaintiff
Tejeda and where they had expected to sleep that night/
morning).

191.   Rather, Plaintiffs Urbina and Scott were, as a
consequence of the unlawful, improper, reckless, and delib-
erately indifferent and wrongful police directive to leave
the area, required to walk in what to Plaintiffs Urbina and
Scott was an unsafe neighborhood where they had just been
the subject of an overt racially antagonistic and hostile
and threatening and verbally and physically verbal assault
of which the New York City Police Officers, then at the

scene in that neighborhood, were actually aware or should have been aware.

192.  Moreover and per the reckless and deliberately in-different and wrongful;, improper, and unlawful directives of the New York City Police Officers then at the location, Plaintiffs Urbina and Scott were not only required to leave the area altogether (this notwithstanding that requiring them to leave the area was unlawful, wrongful, and other-wise improper), but they were required to leave in the di-rection where the Plaintiff's assailants had left the area (as described), something of which the New York City Police Officers (some or all) were actually aware or should have been aware.

193. Such affirmative directives, actions, and conduct of the New York City Police Officers as described affirma-tively and recklessly and with deliberate indifference to the rights, welfare, and well being of Plaintiffs Urbina and Scott subjected Plaintiffs Urbina and Scott to much greater jeopardy when they were compelled to walk in the neighborhood; and such affirmatively and recklessly, and with deliberate indifference subjected them to a much greater risk of bodily injury from their assailants, of which the New York City Police Officers were aware or should have been aware, who were, it is believed, still in the neighborhood (in the direction of where Plaintiffs Urbina and Scott were required to walk).

194.  Plaintiff Torres was transported by New York City Police Officers from the location [as described above] to the 43rd Precinct where he was processed and, after a period of time, released with a Summons/Desk Appearance Ticket.

195.  Plaintiff Torres believes he was charged with dis-orderly conduct although that which is written on the Sum-mons/Desk Appearance Ticket makes no sense and has no rela-tionship whatsoever, in its substantive narrative, to any-thing that transpired during the event as described previ-ously.

196.  Given the actions and conduct of Plaintiff Torres as described and as it took place as described, no reason-able and competent law enforcement officer could have formed an objectively reasonable belief that Plaintiff Tor-res did anything unlawful or improper to justify his stop,

detention, custodial arrest and the preferral of a charge
of disorderly conduct or any other offense under the law.

197.  Plaintiff Tejeda was issued a Summons and was
charged with what he believes to be a disorderly conduct
offense.

198.  Given the actions and conduct of Plaintiff Tejeda
as described and as it took place as described, no reason-
able and competent law enforcement officer could have
formed an objectively reasonable belief that Plaintiff
Tejeda did anything unlawful or improper to justify his
stop, detention, custodial arrest and the preferral of a
charge of disorderly conduct or any other offense under the
law.

199.  Plaintiff Lisby was issued a Summons and was
charged with what he believes to have been a disorderly
conduct offense.

200.  Given the actions and conduct of Plaintiff Lisby
as described and as it took place as described, no reason-
able and competent law enforcement officer could have
formed an objectively reasonable belief that Plaintiff Lis-
by did anything unlawful or improper to justify his stop,
detention, custodial arrest and the preferral of a charge
of disorderly conduct or any other offense under the law.

201.  It is believed that the actions taken by the New
York City Police Officers against each of the Plaintiffs,
individually and collectively, were part of and propelled
by Plaintiff's the New York City Police Department "quality
of life" crime offense initiatives which caused the Plain-
tiffs to be subjected to objectively unreasonable stops and
detentions and arrests and/or to objectively unreasonable
searches of their persons and/or objectively unreasonable
entry into a residence of one of the Plaintiffs and/or to
the objectively unreasonable search of the residence of one
of the Plaintiffs and/or to the otherwise objectively un-
reasonable actions against the Plaintiffs resulting in in-
jury and damage to each of the respective Plaintiffs, each
in their own specific and particular manner and fashion.

202.  In that regard and as reported in a February 28,
2014 New York Daily News article, the New York City Police
Commissioner William Bratton, in defending the targeting of

$2.50 fare cheats as part of a crime fighting strategy dating back to his 1990's New York tour of duty as the then New York City Police Commissioner during the tenure of Mayor Rudolph Giuliani, stated: "Some people might say, 'Why are you worried about that?" "the 'New York miracle,', if you will, began with fare evasion. Twenty-five years later, 'we're still at it."

203. The New York Times reported in a March 5, 2014 article that Police Commissioner Bratton, "speaking at a breakfast meeting of business leaders at the Waldorf Astoria" on March 4, 2014, "signaled that he intended to model his patrol strategy on the 'broken windows' theory, much as he had at the beginning of his previous tenure as the city's police commissioner in the mid-1990…" Speaking to the "broken windows" policy, Bratton is quoted as saying: If you take care of the little things, then you can prevent a lot of the big things".

204. Continuing in this regard he is reported to have stated: "That has been the foundation of my policing strategy", which, as summarized in the Times article "holds that maintaining order and curbing low level violations help reduce more serious crime.

205. The Times reported that Police Commissioner Bratton said that the "broken-windows policing theory", "works and it will remain a cornerstone of the policy" of the New York City Police Department.

206. Finally and according to the New York Times which summarized the Commissioner's position, stated that "he [the Police Commissioner] intended for his officers to aggressively enforce the law against low-level offenders to ensure that public places feel safe."

207. The "broken windows" policing strategy is otherwise and sometimes referred to as a "quality of life" crime enforcement policing initiative and/or strategy.

208. As a consequence of the policy, New York City Police Officers are propelled to make low level, alleged quality of life offense objectively unreasonable stops, detentions and probable cause lacking arrests and to utilize unnecessary and unreasonable force associated therewith and to make objectively unreasonable personal searches of indi-

viduals and/or to make objectively unreasonable entries
into the residences of individuals and/or to make objec-
tively unreasonable searches of premises into which the Of-
ficers have entered and/or to inflict objectively unreason-
able conditions on individuals all of which police activity
and conduct is designed to satisfy the aggressive enforce-
ment of the quality of life, "broken-windows" policing
strategy [as described] of the City of New York, including
the conduct taken herein[as described] by the New York City
Police Officers against the Plaintiffs, individually and
collectively.

209.   The Plaintiffs committed no criminal or any other
offense whatsoever and no reasonable police officer could
have believed that the Plaintiffs committed any criminal or
any other offense under the law to justify any stop and de-
tention or arrest and/or to justify the utilization of the
unreasonable, unnecessary and excessive force applied to
the Plaintiffs associated with any stop and detention and/
or arrest and/or to justify the utilization of any search
of the Plaintiffs and/or of any of the property of any
Plaintiff.

210.   While the actions and conduct of the New York City
Police Officers were unlawful they were taken in the course
of their duties and functions and incidental to the other-
wise lawful performance of those duties and functions as
New York City Police Officers and as an agents and employ-
ees of the City of New York.

211.   There was no objectively reasonable suspicion or
belief for the stop and detention of any Plaintiff by the
afore-described Police Officers; and/or there was no objec-
tively reasonable probable cause belief for the arrest of
any Plaintiff by the afore-described Police Officers; and/
or there was no objectively reasonable basis for the uti-
lization of the force applied by the afore-described Offi-
cers to any of the Plaintiffs; and/or there was no objec-
tively reasonable basis to engage in any search of the per-
son or property of any of the Plaintiffs; and/or there was
no objectively reasonable basis to attach any other condi-
tion upon any of the Plaintiffs [as described heretofore].

212.   It is believed that the actions and conduct herein
described were propelled by the crime offense enforcement
initiatives of the City of New York, including the "broken-

27

windows"/"quality of life" crime offense strategies/initia-
tives which were first conceived by New York City Police
Commissioner William Bratton back in the 1990's [when he
first served in that capacity during the mayoralty of
Rudolph Giuliani] and continued to this point in time when
he re-assumed that position and which are grounded in the
philosophy of the "ends justifies the means".

213.   Such crime offense enforcement initiatives/strate-
gies propel New York City police officers to stop and de-
tain individuals, when there is no basis for the stop and
detention of individuals, and/or to arrest individuals and,
by such, to generate arrest statistics and to otherwise
make examples of individuals in the hope that such would
depress actual crime or other unlawful conduct by individu-
als who might be inclined to engage in such criminal or
otherwise unlawful conduct.

214.   The Plaintiffs herein were unlawfully stopped and
detained and/or arrest and/or subjected to excessive and
unreasonable and unnecessary force and/or subjected to un-
reasonable personal and/or property searches and/or sub-
jected to the imposition of otherwise unreasonable condi-
tions.

215. The New York City policing policies, practices,
strategies, and initiatives [as described] and as imple-
mented and the law enforcement actions and activities by
and of New York City police officers propelled thereby in
furtherance of the afore-described policing policies, prac-
tices, strategies, and initiatives [as described] fall dis-
proportionately upon people of color including Latinos and
African Americans and upon the communities and neighbor-
hoods in which they are residing in the City of New York.

216.   The actions, conduct, policies and practices and
customs herein described violated the rights of each of the
Plaintiffs, individually and collectively, as guaranteed to
each of them under the Fourth Amendment and Thirteenth and
Fourteenth Amendments to the United States Constitution and
the Civil Rights Acts of 1866 and 1871, 42 U.S.C. Sections
1983, 1985, and 1986.

217.   The actions, conduct, policies and practices, and
custom violated the rights of each of the Plaintiffs, indi-
vidually and collectively, under the laws and Constitution

of the State of New York including the stop and detention of the Plaintiffs and/or the arrest of the Plaintiffs and including the assault and battery committed against the Plaintiffs in conjunction with the stop and detention and/or arrest of the Plaintiffs and including the personal and property search of the Plaintiffs and/or including the imposition of otherwise objectively unreasonable conditions on the Plaintiffs associated with the police activities and actions and conduct as heretofore described.

218.   The actions, conduct, policies and practices and customs were negligent and otherwise the proximate cause of the injuries and damages suffered by each of the Plaintiffs.

219.   Each of the Plaintiffs suffered injuries and damages including loss of liberty, fear, anxiety, mental distress, emotional anguish, embarrassment, humiliation, and psychological trauma and physical pain and suffering, some of which, for some or each of the Plaintiffs, will be enduring and permanent.

220.   None of the Plaintiffs has yet placed a monetary value on the damages which he incurred as a consequence of the injuries which were inflicted upon him although each believes the damages to be substantial and to include both compensatory and punitive damages.

V.   CAUSES OF ACTION

A.   FIRST CAUSE OF ACTION

221.   The Plaintiffs reiterate Paragraph #'s 1 through 220 and incorporate such by reference herein.

222.   Plaintiffs Eddy Tejada, Wesley Lisby,  and Daniel Torres were unlawfully stopped and detained and arrested and issued summonses and/or placed in actual custody and/or in placed in constructive custody in violation of their rights as guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

223.   Each of the Plaintiffs suffered injuries and damages.

B.   SECOND CAUSE OF ACTION

224.   The Plaintiffs reiterate Paragraph #'s 1 through 223 and incorporate such by reference herein.

225.   Plaintiffs Eddy Tejeda ,Wesley Lisby, and Daniel Torres were unlawfully stopped and detained and arrested and issued summonses and/or placed in actual custody and/or in placed in constructive custody in violation of their rights as guaranteed under the laws and Constitution of the State of New York.

226.   Each of the Plaintiffs suffered injuries and damages.

C.   THIRD CAUSE OF ACTION

227.   The Plaintiffs reiterate Paragraph #'s 1 through 226 and incorporates such by reference herein.

228.   When the Plaintiffs Wilfredo Urbina and Dayshaun Scott were directed by New York City Police Officers to leave Plaintiff Tejeda's apartment, where they were lawfully invited and had a right to be present and, then, when they were directed by New York City Police Officers to leave the block on which Plaintiff Tejeda's apartment while at the same time seizing the vehicle of Plaintiff Torres and taking Plaintiff Torres into custody, the Defendant Officers, by their actions, placed Plaintiffs Urbina and Scott in constructive custody during which constructive custody each of the Plaintiffs Urbina and Scott was assaulted by third parties and each of the Plaintiffs Urbina and Scott were subjected to serious physical and psychological injuries by said third parties.

229.   The constructive custody of Plaintiffs Urbina and Scott by New York City Police Officers was the proximate cause of the injuries suffered by Plaintiffs Urbina and Scott, the latter of which were foreseeable, under all of the circumstances.

230.   The actions of the Defendant New York City Police Officers violated the respective rights of Plaintiffs Urbina and Scott under the Fourth and Fourteenth Amendments

to the United States Constitution and the Civil Rights Act
of 1871, 42 U.S.C. Section 1983.

231. Each of the Plaintiffs Urbina and Scott suffered
injuries and damages.

### D.   FOURTH CAUSE OF ACTION

232.  The Plaintiffs reiterate Paragraph #'s 1 through
231 and incorporates such by reference herein.

233.  Defendant Lo and other Defendant Officers acting
in concert with him affirmatively engaged in deliberately
indifferent and reckless conduct that affirmatively placed
the Plaintiffs at an increased risk to their safety, well
being, and welfare.

234.  The Defendants did so when, having come to the
scene and being aware that the Plaintiffs (or some) were
being subjected to a racially hostile, racially charged
verbal assault by a group of Hispanic individuals (three
males and one female who were acting together and in con-
cert with each other) and by threatening physical activity
of that group toward the Plaintiffs (or some thereof) asso-
ciated therewith, they failed to intervene to safeguard the
Plaintiffs (or some thereof).

235.  The Defendants had an affirmative duty to inter-
vene on behalf of the Plaintiffs to safeguard their well
being and welfare but, rather than doing so, treated the
Plaintiffs as the offending parties rather than, as they
were (or some thereof), the subject and victims of a
racially charged hostile, threatening, assault by the group
of Hispanic individuals who, acting together, were endeav-
oring to interfere with the Plaintiffs' (or some) right to
traverse the public way in the neighborhood where the liti-
gation event and transaction herein was occurring.

236.  Accordingly, the Defendants, acting in concert
with each other, allowed the group of Hispanic individuals
to leave and flee from the scene (as described) and to fade
into the night and into the neighborhood.

237.  The Defendant, as well, undertook to arrest some
or all of the Plaintiffs including, without probable cause,
Plaintiff Torres who had a vehicle and was the designated

driver and to improperly detained and seize and place in constructive custody Plaintiffs Scott and Urbina when, without legal justification, compelled them to leave the neighborhood and do so in a direction where the Defendants knew or should have known was the direction in which the group of Hispanic individuals had left and fled when the Defendant Officers arrived at the scene.

238.  The Defendants' affirmative conduct as described in each of its parts and collectively within Paragraph # 236 and as otherwise described in the allegations of the Complaint (as adopted and incorporated by reference herein) was reckless and deliberately indifferent and placed the Plaintiffs (some thereof) in an increased risk to their safety, welfare and well being and affirmatively caused the Plaintiffs (some thereof) to be placed in a dangerous situation.

239.  The actions and conduct of the Defendants, individually and acting in concert with each other, placed them in and as part of the racially charged, verbal and physically threatening concerted actions and conduct of the four Hispanic individuals that was directed at the Plaintiffs and that the Defendants were aware of or should have been aware of.

240.  The actions and conduct of the Defendant parties, individually and collectively, in their individual and collective components, from the beginning to the end of the litigation event and transaction, shocks the conscience in as much as it put the Defendant Officers into and as part of the concerted, racially charged assault against the Plaintiffs (some thereof) by the four Hispanic individuals.

241.  The actions and conduct of the Defendant parties, individually and collectively, violated the Plaintiffs' rights as guaranteed under the Civil Rights Acts of 1866 and 1871, 42 U.S.C. Sections 1983, 1985 and 1986, and the Fourth, Thirteenth and Fourteenth Amendments to the United States Constitution.

242.  The Plaintiffs suffered injuries and damages.

FIFTH CAUSE OF ACTION

243.   The Plaintiffs reiterate Paragraph #'s 1 through 242 and incorporate such by reference herein.

244.   The actions of the Defendant New York City Police Officers were negligent; and the actions violated the respective rights of Plaintiffs Urbina and Scott under the laws and Constitution of the State of New York.

245.   Each of the Plaintiffs Urbina and Scott suffered injuries and damages.


        E.    SIXTH CAUSE OF ACTION

246.   The Plaintiffs reiterate Paragraph #s 1 through 245 and incorporate such by reference herein.

247.   The Plaintiff Tejeda's apartment was, under the coercive actions of the Defendant New York City Police Officers and without the voluntary consent of Plaintiff Tejeda who was the resident owner of the apartment and present at the time of the entry and search, unlawfully entered and searched by the New York City Police Officers in violation of Plaintiff Tejeda's rights under the Fourth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

248.   Plaintiff Tejeda suffered injuries and damages.

        F. SEVENTH CAUSE OF ACTION

249.   The Plaintiffs reiterate Paragraph #'s 1 through 248 and incorporates such by reference herein.

250.   The entry into and search of Plaintiff Tejeda's apartment violated the Plaintiff's rights under the laws and the Constitution of the State of New York.

251.   Plaintiff Tejeda suffered injuries and damages.

        D.   EIGHTH CAUSE OF ACTION

252.   The Plaintiffs reiterate Paragraph #'s 1 through 250 and incorporate such by reference herein.

253.   The policies, practices and customs herein described propelled the actions and conduct herein. Those policies, practices, and customs violated the Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

254.   The Plaintiffs suffered injuries and damages.

### E.   NINTH CAUSE OF ACTION

255.   The Plaintiffs reiterate Paragraph #'s 1 through 254 and incorporate such by reference herein.

256.   It is believed that the policies and practices as applied have a disproportionate impact on members of New York City's minority communities, especially and particularly Black and Brown peoples including Latino community members and African American community members.

257.   The policies and practices as applied are racially discriminatory and/or national origin discriminatory (based on Hispanic national origin) and violate the Plaintiff's rights under the Fourth, Thirteenth and Fourteenth Amendments to the United States Constitution and the Civil Rights Acts of 1866 and 1871, 42 U.S.C. Sections 1983, 1985, and 1986.

258.   The Plaintiffs suffered injuries and damages.

### F. TENTH CAUSE OF ACTION

259.   The Plaintiffs reiterate Paragraph #'s 1 through 258 and incorporate such by reference herein.

260.   The policies and practices as applied violated the Plaintiffs' rights under the laws and Constitution of the State of New York.

261.   The Plaintiffs suffered injuries and damages.

### G.   ELEVENTH CAUSE OF ACTION

262.   The Plaintiffs reiterate Paragraph #'s 1 through 261 and incorporate such by reference herein.

263. When the City of New York represents its Officers in federal civil rights litigations alleging unconstitutional actions by its officers (which is almost always the case in 99.99 percent if not more of the situations where an Officer seeks representation), it is believed that it ordinarily and uniformly and as a matter of policy and practice indemnifies its Officers for any award of both punitive damages and compensatory damages.

264. It is believed that the Officer-employee executes a retainer indemnification and representation letter which requires the Officer-employee, in return for indemnification, to subordinate his or her interests to the interest of his/her employer and indemnifier –the Defendant City of New York.

265. It is believed, moreover, that, when a judgment is obtained against a New York City Police Officers for an Officer's violation of an individual's federally guaranteed Constitutional and civil rights and where the Officer has been represented by the New York City Attorney's Office and where the City of New York has paid the judgment of damages (compensatory and/or punitive damages), the Officer almost never has been subjected to a New York City Police Department disciplinary hearing and/or the imposition of discipline; and it is believed that, when a settlement has been made in such a litigation, the Officer ordinarily is never even informed of such.

266. It is believed, moreover, that when a judgment is obtained against a New York City Police Officer being represented by the New York City's attorney office for the violation of an individual's constitutional and civil rights, the City of New York takes no action whatsoever to address such and discipline and/or train-retrain the Officer in any form or fashion for his or her unlawful and unconstitutional conduct and/or that the City does not change those policies and practices that propelled said conduct.

267. The City of New York is, under the circumstances, the real party in interest.

268. The named and unnamed individual Defendants are employees and agents of the City of New York and their conduct, as described, was taken in the course of their duties and functions as New York City Police Officers and, in

their capacities as such, as agents and employees of the City of New York.

269.   Their actions and conduct, while unlawful and un-constitutional, nonetheless were actions and conduct taken to the otherwise lawful performance of their duties and functions as agents and employees of the City of New York.

270.   The Plaintiffs are entitled to recover against the City of New York for the conduct of its named and unnamed Officers under the federal claim jurisdiction pursuant to the doctrine of respondeat superior.

271.   The Plaintiffs suffered injuries and damages.

### H.   TWELFTH CAUSE OF ACTION

272.   The Plaintiffs reiterate Paragraph #s 1 through 271 and incorporate such by reference herein.

273.   The Plaintiffs are entitled to recover against the City of New York for the conduct of its named and unnamed Officers under the pendent party/pendent State law claim jurisdiction pursuant to the doctrine of respondent superior.

274.   The Plaintiffs suffered injuries and damages.

   WHEREFORE and in light of the foregoing, it is respect-
fully requested that the Court assume jurisdiction and:

          [a] Invoke the jurisdiction of this Court.

          [b] Award appropriate compensatory and
              punitive damages.

          [c] Award appropriate declaratory and
              injunctive relief.

          [d] Empanel a jury.

          [e] Award attorney's fees and costs.

          [f] Award such other and further relief as
              the Court deems to be in the interest
              of justice.

DATED: Bronx, New York
       December 15, 2014

Respectfully submitted,

/s/Poupa Jenny Marashi_____
POUPA JENNY MARASHI, ESQ.
930 Grand Concourse #1E
Bronx, New York 10451
[917] 703-1742
[718] 585-3400/FAX
marashi7@yahoo.com

JAMES I. MEYERSON, ESQ.
1065 Avenue of the Americas
Suite # 300 (c/o NAACP-New York State Conference)
New York, New York 10018
[212] 344-7474Extension 129
[212] 409-8890/EFAX
jimeyerson@yahoo.com

ATTORNEYS FOR THE RESPECTIVE PLAINTIFFS
BY:_____